Good morning, your honors. Knute Johnson for Petitioner Brett Marquis. With me at counsel table is my intern, with the court's permission, Emerson Wheat. Thank you. Good morning, Mr. Wheat. Welcome. Thank you, your honors. Your honors, I believe that the decision of the California courts set up the false premise of a conflict of rights, and the one right is obvious. Petitioner's right to confront and bar any witness against him, particularly the only accuser against him, and as the Superior Court noted, someone whose credibility could be called into issue and who should have been present. And the other right that false premise set up was the right of the mother to get her son back to Mexico. And that's a false conflict because nowhere in the Constitution does it that particular right, to deprive a defendant of his right to confrontation by simply saying, I don't want to participate, unless you can assure me he'll get back. Do you agree that they can use grand jury testimony or preliminary hearing testimony? I guess in this case it was a prelim. Do you agree that they can use prelim testimony if a witness is unavailable? In general, yes.  If not enough evidence. Any exceptions that don't apply here, particularly? Exceptions that don't apply here in particular, although I would say that a substantial amount of impeachment was developed in between the preliminary hearing and the trial. What I'm getting at is, the state court ruled that the witness was unavailable, and this being an AEDPA case, we have to find, in order to rule for you, that the finding of unavailability was not even wrong. It was completely unreasonable. Well, I understand what the court's saying, is that there's two parts of it. There's not just, we raised this both in the briefing before the district court, not only that it's an unreasonable application of clearly established law, but also an unreasonable finding of facts. In this case, the finding of fact was that the California courts said that the witness was essentially unavailable, because his mother essentially didn't want to bring him to court. Well, that's certainly not an appropriate standard. It's absolutely unavailable. And in this case... You mean like metaphysically unavailable? I mean, just completely impossible in the realm of, it might have been to conclude? No, of course not. I understand where you're, or I think I may understand where you're going with that question. Of course, there are no rules requiring impossibility. But that's the issue in this case, is that there were certainly opportunities that... Suppose he's in a hospital, not a treatment facility. Suppose he's being treated for cancer or something. Would that pass muster as unavailable? Well, you know, there's a lot of different types of cancers, a lot of different types of treatments, and there's a lot of ways to handle that particular situation. You know, I've certainly been involved in cases where witnesses were very ill, or it was difficult for them to get to court. Okay, I take your point. The judge says, I've heard the facts, and this young man, this is basically a life-saving measure to keep him down there. And his mother said this is the last chance to save him, and there's no way to assure that he will go back if we let him out. And he went there kicking and screaming, and literally kicking and screaming. How is that an unreasonable conclusion on his part? Because there were ways to get him back, and those ways were ignored. Like what? How would they have gotten him back? Well, there's no question, let me complete the loop here, that they could have gotten him from the facility to the border. There's no question based on the... Well, there is a question. They couldn't have done it. The mother had the trump card. Is there any doubt that the mother had the trump card? Unless the mother says he's leaving, he's not leaving that facility in Mexico, and nothing the California court can do can force the Mexico facility to give him up. No, but the... And that's part of the problem in this case, is that the California court clearly had the authority to threaten contempt, to figure out the solution to the problem. The district attorney actively sided with the mother in this, and said, don't hold her in contempt. The district attorney acted as the party preventing this witness from coming to court. And that's a real problem, because the confrontation clause has within it the promise of direct facial confrontation. The Supreme Court has said over and over and over And you can't even screen a witness off. You can't even put a witness in there, and put a screen between that witness and the jury and the defendant, unless there is a finding that that's necessary. And in this case, that was a core right that was denied, that the district attorney tried to block. And there can be... I'm not saying it happened in this case. I thought the court referred to all of the attempts that the district attorney had made, including obtaining this extraordinary federal subpoena to personally serve the young man, in order to try and go through the State Department, and to try to go through diplomatic channels. But all those efforts were unavailable. The... This court said in Yilda that an incompetent attempt is not good faith. The Supreme Court has said, I believe it was in Ohio v. Roberts, that the possibility of a refusal... Excuse me, I believe it was Barber v. Page. The possibility of a refusal does not excuse not asking for the witness to be brought forward. In this case, there were... The district attorney clearly did things, and... But they never tied off the loop. They never took the extra step. And frankly... Well, what is the extra step? Because, you know, it seems to me that the from the Supreme Court cases, where they found lack of good faith, or lack of reasonable efforts to procure the attendance of the witness. I won't tick them all off, but there were a number of things that the D.A. did to try and get this witness to come of his own volition. And the only thing that they did not do, and that was up to the trial judge, was to hold the mother in contempt, in order to try and force her to bring the boy here. Well, there were two things. He could have threatened contempt, number one. And number two, the court could have ordered the county to pay reasonable witness expenses, which would in this case include transportation from the court back to the border. And the mother... Would that have been kidnapping? No, absolutely not. And we cited... Do you know that the boy would have willingly gone from the courthouse back to the border? That doesn't matter. Because the mother has an absolute right under California law to control a minor child. And if that requires employing a third party to control that child and take him to a facility for the child's best interest, a California parent has that right. And I cited the proposition for that in the opening brief. Absolutely, that is not kidnapping. Now, it may be that the district attorney on their own could not do it. A parent always could, and there is certainly nothing... Would the court have the authority to order a police officer or a sheriff deputy to escort the young man back to the border so that he could be handed over to the Mexican people? You know, I'm not sure. I think that probably they could. If it's... The problem is, it's just the county wanted to get involved in... Well, the court didn't think it had that authority. I mean, the problem we've got is that once you release the witness from the obligation of the subpoena, they can go wherever they want to go. Well, I think the court is getting off track here on what would guarantee Victor getting back to Mexico and what would satisfy the mother. And the mother essentially said, she essentially said anything, that if I'm satisfied that I can get him back there, I'm fine and he'll come. And the court ignored that. And what would have satisfied her clearly was having someone to take him, whether it's a private party and there's... And the record shows that there were private parties and private companies that did that work on occasion, a lot, I don't know how often, taking juveniles against their will to treatment facilities. And that's not kidnapping because parents are allowed to do that. How would that have happened? I'm trying to figure out how this plays out. The kid would theoretically then be in the wit to stand, testify and then what happens when he steps down? He bolts out of the courtroom and these guys chase after him or what happens? Well, and that's... First off, if there's someone there and the parent has the authority to take the child against their will, if it required restraining the child, I'm certain they could do that. But that's not the question. The question is, would it have satisfied the mother? And the record shows very clearly that having the promise of someone there to get him down there would have satisfied her. And in fact, she and her, I believe it was her brother, the boy's uncle, had taken him down in the past. He was kicking and screaming, but clearly... He was kicking out the windows of the vehicle, wasn't he? Well, I think he might have been kicking the windows. I don't know what the record reflects. He kicked them out. But he also wanted to testify. The record shows that he cooperated with the district attorney. And that's the problem. And I see by your Honor's finger that probably... You're out of time. Out of time. Thank you. Thank you. Boyd. May it please the Court, Daniel Rogers, appearing for respondent. Your Honors, as Judge Silverman pointed out initially, this is an AEDPA case. And the focus of this Court's attention has to be on the reasonableness of the State Court's application of an admittedly very insufficient diligence. In this case, a fair-minded jurist could certainly have made the determination that on these facts, the prosecutor exercised sufficient diligence to satisfy his obligations under the Confrontation Clause and permit the preliminary hearing  What's your answer to counsel's point that you could have come up with money to hire goons basically to take this kid back to Mexico? Well, my first point is that, as the district court points out, I think focusing on the money is a false trail. Money was not the issue here. The issue was hiring goons to force a juvenile against their will to travel to a location in Mexico. Counsel talks about kidnapping statutes in California. Pointedly, he ignores the question of the legalities of this conduct once the borders cross. I mean, the Constitution does not require the San Diego County District Attorney's Office to risk an international incident in order to establish due diligence. There's simply no controlling Supreme Court authority that even suggests that possibility. And I would point the court to Mancusi to the idea that the opposite is, in fact, the case. It actually strikes me as a weak answer. Rather than speak to the facts of the situation we know of, that is, the difficulty of getting him from the courthouse to the border, you raise the specter of an international incident. Where's the international incident? Let's say that these goons are traveling to Casa Maldonado, the facility in Mexico, and they cross the border with the juvenile. And he's trying to kick out the windows. Well, the facility said they had their own goons. We get them back and forth to the border. So presumably there's a handoff at the border someplace. That is the case. However, when the District Attorney contacted the Mexican Attorney General's office, the Mexican Attorney General specifically said that the San Diego County District Attorney's Office could not be involved in these activities in Mexico. I mean, there was a sovereignty issue. Paying a third party, I would submit to you, would have essentially the same effect. Let's go back to the example that I was offering the court. The minor flags down a passing police car, says, I'm being kidnapped. These guys say, no, we're bringing him from court. The San Diego District Attorney's Office has paid us to do that. Who knows what would have happened? We have the Mexican Attorney General's office. Well, the logical answer seems to me to be, I'm his mother. These guys are taking him back to the treatment facility because he's an addict. Your Honor, we don't know. That happens. We don't know the issues regarding Mexican law that would be raised in this case. We only have what the Mexican Attorney General said, which was rather categorical. You can't be involved in this. You can't be conducting these kinds of activities. Well, you know, Pakistan told the United States, you can't be involved either. I don't know that that's a complete answer to the question. If the issue is, if it's not about the money, what is it that prevents your office from giving the mother the money that she needed to hire the facility's goons on that side of the border? Or whoever it is she can get, what is it that prevents a sheriff's deputy from being instructed by the court to take him from the courthouse back to the location adjacent to the border? Your Honor, I'm unaware of any California legal authority that permits a state court to empower a peace officer to take an individual who's committed no crime, who is... Is there anything that prevents the court from instructing a peace officer to follow the directions of the mother as to the whereabouts of this troubled child? As Your Honor has framed the question, I don't know whether there's anything that permits it or disallows it. I know such a court... Judges are sometimes expansive. If there's not something that says no, why isn't it the responsibility of the court to do what it can to make the witness available by doing an order such as that? Well, again, I don't think that the controlling Supreme Court authority requires the California courts to go out on a limb and try every conceivable possible... But you want to flip it around. The specter of a possible international incident is enough to cause the parties to draw back. I mean, from the perspective of the defendant, the prosecutor's in a But at the end of the day, the defendant's problem is that, gee, the witness isn't there. All we've got is this preliminary hearing testimony which came in at a time when I didn't know some of this good stuff I've got on the defendant. And some of it's pretty good. I mean, I was mildly surprised that a conviction was obtained after looking at some of the things that I had there. I wouldn't sure if I'm a defense attorney like to be able to cross-examine this witness on that evidence. So from their perspective, you know, you may be sweating real hard, but how much effort's really being made to lift that veil? Well, Your Honor, again, we have, as this is an AEDPA case, I would say that there might have been additional avenues that could have been explored. They were all fraught with, I think, significant peril. I mean, we could have been, if something bad happened, we could be making significant case law about the civil or criminal liabilities of the county. I simply don't think that a state court is unreasonable in declining to go down that road in order to make this due diligence determination. The United States Supreme Court has never required all possible measures be exhausted. The closest they've come in green, I believe, is saying that they Supreme Court recently reiterated in Harrington v. Richter, this determination on the part of the state court, its application of the controlling federal authority, if any judge could find, any fair-minded judge could find, as the state court did, that there was due diligence here. And there's nothing. I mean, we're having to invent procedures that have never existed before. Well, contempt. I mean, the obvious procedure wasn't tried. So it's not like that everything here is requiring a lot of imagination. Mother was not cited with contempt. Your Honor, the state court made a factual determination that, and I think the specific language was that this was a life or death issue, that she was trying to save this child's life. Implicit in that is that the contempt sanction isn't going to work. This isn't a mother who is depriving the prosecution of this witness out of pique or something of that. She... I understand that. But I also understand from the defendant's perspective, who's facing a real problem because of this and is trying to defend himself, what he has is a court and or prosecutor giving lots of reasons why they really can't do anything about the situation. And nothing gets done about the situation. And the defendant is not, or the defendant is forced to defend himself without this critical witness being subject to cross-examination in front of the jury. Your Honor, respectfully, I would disagree with that characterization. What's wrong with it? Many things were attempted and they bore no fruit. Well, what exactly was attempted? We didn't have a contempt citation. We didn't have payment to anybody to move the witness. We had, I guess, inquiries about the possibility, but in the end, nothing was actually ever tried. I think those, and perhaps I'm running out of time, but perhaps the difference is semantic. I think those are affirmative actions, making those required to go out on that limb when there are significant negative potential consequences. Well, the subpoenas were served on both the boy and the mother, right? Yes. So it's just really a question of why weren't they enforced through the contempt authority. And that's the determination to be made by the trial court. I mean, the prosecutor never asked for the contempt. That's correct. I would disagree with efforts by the court to hold the mother in contempt, but he did not ask. That's correct. Thank you very much, Mr. Bradford. You got it. The subpoenas were served under 28 U.S.C. Section 1783 and California Penal Code Section 1328. Both provide for the payment of either reasonable witness expenses or witness fees and expenses. Those fees and expenses in this case would have included transportation costs, which could have been done, which were lawful. Well, I mean, this is not plus fare to Ensenada Council. This is an extraordinary payment to basically third parties who are going to forcibly deliver a recalcitrant young man who the mother had every reason to believe would flee. And that's a pretty unusual circumstance. That's not your usual witness. No, it isn't a usual witness expense. On the other hand, the payment would be to the mother, and it would be the mother hiring and assuring herself that she could get him back. But yeah, but if the money's being supplied by the county, it's the county paying the goons. I understand. Okay, I see. I've got one second left. Thank you. All right. Thank you very much, gentlemen. The case just argued is submitted. We'll stand in recess. Thank you.
judges: Silverman, Tallman, Clifton